**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AIDIGITAL OPERATING LLC | |
| Plaintiff. | Civil Action No. _____ |
| v. | |
| KYLE KUCHERA AND NOAH HELD | **FILED UNDER SEAL** |
| Defendants. | |

<u>**DECLARATION OF STEPHEN J. MAGLI**</u>

I, **STEPHEN J. MAGLI**, of full age, hereby declare as follows under oath:

1.      I am currently the Chief Executive Officer of AiDigital Operating LLC ("<u>AiDigital</u>" or the "<u>Company</u>"), formerly Stephen J. Corp., and have held this position since I founded the Company in 2018.  AiDigital is headquartered in Glen Head, New York.

2.      I submit this declaration in support of AiDigital's Motion to Seal and Motion for an *Ex Parte* Seizure Order, Temporary Restraining Order, and Order to Show Cause for Preliminary Injunction.  The facts I set forth in this declaration are based on my personal knowledge or knowledge I obtained through my review of corporate records, and otherwise are made on information and belief.  If called as a witness, I could and would testify to the following facts under oath.

**I.      Background and AiDigital's Origins and Work.**

3.      In 2012, I graduated with a Bachelor of Science from Vanderbilt University with a double major in Economics and Cognitive Studies.  While I was in college, I founded a Nashville-based promotions and marketing business.

4.      I have worked in the advertising technology space since 2012, including roles at MediaMath, Nomi/Axper, and GetIntent, which allowed me to hone my skills in business

development, sales, marketing, and advanced analytics.

5.      In 2018, I founded AiDigital, a programmatic digital advertising company that helps agencies and advertisers navigate the digital ecosystem by delivering access, communication planning, strategy, and data to maximize their advertising.

6.      I leveraged my prior experience working at digital advertising firms, knowledge base, platform relationships, and select client relationships to build out a best-in-class operational infrastructure and get the business started with revenues within the first few months of its existence.

7.      AiDigital provides three types of services.  First, AiDigital charges a fee to advertising clients to run their ad campaigns, which includes the planning, launch, and optimization of an advertising campaign across social media, streaming devices, TV, websites, and other media platforms.

8.      Second, it provides demand-side platform ("DSP") services; in other words, it leverages third-party platforms to automate the process of buying and selling digital ad space in real time.

9.      Instead of traditional methods where humans negotiate prices and placements, this proprietary method uses software and algorithms.  The intricate process involves real-time auctions where advertisers (businesses or brands) bid for ad space on websites, mobile apps, and other digital platforms (known as suppliers).

10.     For example, when a user loads a webpage that has advertising space, the website (the supplier) sends a request to a supply-side platform ("SSP") to get the best price on an ad.  The SSP creates an ad request with information such as device type, URL, IP address, category, and data from cookies.  The ad request is then sent to an ad exchange, which connects to DSPs (a media

platform used by advertisers and agencies to set up their digital campaigns). The DSP has the criteria that various advertisers set for their ad placement, targeting criteria, and bidding price. If there is a match, the DSP submits the bids to the ad exchange. The exchange validates all the bids and chooses the winning bid, which is then loaded on the webpage along with the website's content. This entire process occurs in milliseconds while the webpage is loading.

11.     AiDigital provides advertisers with real-time metrics on how well a single ad or an ad campaign is doing, which can be measured by clicks, downloads, installs, or time spent viewing an ad. These are known as key performance indicators ("KPI").

## II.    Programmatic Curation.

12.     In 2022, AiDigital started offering a third type of service called programmatic curation. AiDigital's programmatic curation offering is called LucidX. *See* https://www.lucidx.ai/. AiDigital works with customers on programmatic curation across the United States and globally.

13.     Curation enables third-party organizations to insert themselves into the above digital ecosystem and allows them to provide a targeted fit for an advertiser for ad space from a supplier (website, streaming service, etc.) based on the audience the advertiser is trying to reach, to help the advertiser maximize the impact of the money it spends on ads.

14.     While programmatic advertising has traditionally used "cookies" (that is, data that is collected and saved by a web browser about a user's browsing activity) to target ads to particular users, programmatic curation instead uses data packages to find and share high-quality, relevant content to an advertiser's desired online audience.

15.     Curators bring value to advertisers by creating packages that combine their unique offering—such as better inventory selection, proprietary data or identity segments, or preferential publisher access or rates—with hand-picked supply from across the open internet. This results in

a tailored inventory that is aimed at better hitting the advertisers' KPI.

16.    AiDigital primarily uses three vendors, ██████████████████ which provide it with curation platforms that AiDigital uses to develop its data sets to help advertisers hit their KPI on ad campaigns.  While these vendors do not exclusively provide services to AiDigital, there is no open sign-up for these platforms.  In other words, it is not possible to simply go on the websites and make an account.  ██████████████████ contract only with known entities in the advertising industry.  It is necessary to have the goodwill as a trusted company in the space in order to develop a relationship with these platforms and obtain accounts with them.

17.    AiDigital takes the data sets from these platforms and uses them to connect advertisers with suppliers for the right advertising campaigns using the right audience data.  AiDigital obtains their data sets through password-protected accounts and stores them on the Company's computer systems, which can only be accessed through an employee's password-protected company computer.  AiDigital does not share its methodology for using █████ data sets for programmatic curation with anyone outside of AiDigital.  And only those employees who directly work in programmatic curation are entrusted with the details of the curation process.

18.    The identities of AiDigital's clients are not readily available to the public or its competitors.  AiDigital has spent significant time and resources over the past five years to develop this client list.  AiDigital stores client information on its computer system, which can only be accessed through an employee's password-protected company computer and does not otherwise share its client lists with anyone outside of AiDigital.

19.    Similarly, the pricing AiDigital offers to its customers is not readily available to the public or its competitors.  AiDigital does not publicize the pricing information on its website or otherwise and does not disclose the pricing information to anyone outside of its customers.

20.     AiDigital charges a fee for its services based on an advertiser's media spend over a given period (this can be monthly or quarterly).  AiDigital also charges additional fees based on how successful the campaign is (the number of times that a user in the target audience sees an advertisement).

### III.    Kyle Kuchera & Noah Held.

21.     AiDigital hired Kyle Kuchera ("Mr. Kuchera") as Senior Sales Director and Noah Held ("Mr. Held") as Curation Associate in 2022 to help AiDigital build out its programmatic curation service.

22.     Mr. Kuchera and Mr. Held, who are cousins, signed Employment Agreements and Restrictive Covenant Agreements (the "Kuchera Agreement" and "Held Agreement" and collectively the "Agreements") on September 13, 2022, and December 20, 2022, respectively, to confirm their employment with AiDigital.  A true and accurate copy of the employment agreement between AiDigital and Mr. Kuchera is attached as **Exhibit A**.  A true and accurate copy of the employment agreement between AiDigital and Mr. Held is attached as **Exhibit B**.

23.     In the Employment Agreements, Mr. Kuchera and Mr. Held expressly agreed that, during their employment, they would not engage in competitive enterprises with AiDigital.  In Paragraph 1 of their Employment Agreements, Mr. Kuchera and Mr. Held agreed:

> [Y]ou will devote all of your business time and attention to the business of the Company and that you will not, directly or indirectly, engage or participate in any personal, business, charitable or other enterprise that is competitive in any manner with the business of the Company, whether or not such activity is for compensation.

Ex. A at 1; Ex. B at 1.

24.     Second, Mr. Kuchera and Mr. Held agreed in their Employment Agreements that AiDigital retained ownership rights in all intellectual property that Mr. Kuchera and Mr. Held created during the course of their employment.  They agreed in Paragraph 3 as follows: "The right

to Intellectual Property created by you in the course of performing services for the Company belongs to the Company and any and all work performed by you during the course of your employment with the Company will be deemed 'work for hire.'" Ex. A at 2; Ex. B at 2.

25.     Mr. Kuchera and Mr. Held also expressly agreed they would not use or disclose AiDigital's trade secrets and confidential information.   In Paragraph 5 of their Employment Agreements, Mr. Kuchera and Mr. Held agreed:

> By signing this letter below, you agree that during your employment and thereafter that you shall not use or disclose, in whole or in part, the Company's or its clients' trade secrets, confidential and proprietary information, including client lists and information, to any person, firm, corporation, or other entity for any reason or purpose whatsoever other than in the course of your employment with the Company or with the prior written permission of the Company's CEO.

Ex. A at 2; Ex. B at 2.

26.     To protect the legitimate business interests of AiDigital and in consideration of AiDigital's willingness to provide Mr. Kuchera and Mr. Held with access to its confidential information, customer relationships, and goodwill, Mr. Kuchera and Mr. Held each agreed to a covenant against competition.   In Paragraph 1 of the Restrictive Covenants Agreements, Mr. Kuchera and Mr. Held agreed not to "directly or indirectly, become employed by, engage, invest or participate in a Competitive Business" during the term of their employment with AiDigital and for one year thereafter.  Ex. A at 6; Ex. B at 6.

27.     To protect the legitimate business interests of AiDigital and in consideration of the Company's willingness to provide Mr. Kuchera and Mr. Held with access to its confidential information, customer relationships, and goodwill, Mr. Kuchera and Mr. Held also agreed to a covenant against solicitation of clients.  In Paragraph 2 of the Restrictive Covenants Agreements, Mr. Kuchera and Mr. Held agreed in pertinent part:

> Employee understands and agrees that during the period of Employee's employment with AiDigital, and for one (1) year following the separation of Employee's employment for any reason, including, without limitation, termination by AiDigital for cause or without cause, Employee shall not directly or indirectly solicit business from, or provide or attempt to provide services to, any Client to which Employee has been introduced or about which Employee has received information through AiDigital, or any Client for which Employee has performed services while employed by AiDigital.

Ex. A at 6; Ex. B at 6.

28.    To protect the legitimate business interests of AiDigital and in consideration of the Company's willingness to provide Mr. Kuchera and Mr. Held with access to its confidential information, customer relationships, and goodwill, Mr. Kuchera and Mr. Held also agreed not to use or disclose the Company's confidential information.  In Paragraph 4(a) of the Restrictive Covenants Agreements, Kuchera and Held agreed in pertinent part:

> **Preservation of Confidentiality**. Employee has not and will not, either during or at any time after his/her employment with AiDigital, without the prior written consent of AiDigital, communicate or disclose to, or use for the benefit of Employee or any other person or entity, any proprietary or confidential information, trade secret or know-how belonging to AiDigital (collectively, the "Confidential Information"), whether or not such Confidential Information is tangible or intangible, and in whatever form or medium provided, as well as all information that contains, reflects, or is derived from said Confidential Information, except to the extent required to perform the duties of his/her employment, as described in this Agreement.
>
> Confidential Information includes, but is not limited to, all business information, technological information, intellectual property, confidential records, pricing information, marketing information, sales techniques, customer lists, information about customer requirements, terms of contracts with suppliers, subcontractors, and customers, planning and financial information, marketing plans and future business plans. . . .
>
> The obligation not to disclose Confidential Information is perpetual and extends to information of AiDigital's customers, subcontractors, and suppliers who may have disclosed Confidential Information to AiDigital or the Employee as a result of Employee's

status as an employee of AiDigital. Also, Employee will not, without AiDigital's permission: (i) remove any Confidential Information from AiDigital's or customer's premises; (ii) copy or reverse engineer any Confidential Information; or (iii) keep any Confidential Information relating to a customer.

Ex. A at 6–7; Ex. B at 6–7.

29.     Presently, Mr. Kuchera holds the important role at AiDigital of Senior Director of Growth and is highly compensated for this significant position.  Mr. Held holds the important role at AiDigital of Curation Associate and is highly compensated for this significant position.

30.     Mr. Kuchera and Mr. Held were both introduced to the ████████████ and other platforms through AiDigital and have benefited from the goodwill associated with AiDigital's relationship and introduction.  Matthew Bayer ("Mr. Bayer"), President of AiDigital, introduced Mr. Kuchera and Mr. Held to contacts at all three platforms.

31.     In order to access the ████████████ platforms, each person needs their own username and password.  AiDigital normally does not provide its team members with access to the platforms.  However, Mr. Kuchera and Mr. Held, as leaders of the curation business unit, specifically asked for access to the platforms, and in reliance on Mr. Kuchera's and Mr. Held's contractual representations to conduct themselves in accordance with the terms of the Agreements, AiDigital entrusted them with access.

32.     Prior to working at AiDigital, Mr. Kuchera and Mr. Held had no experience working with ████████████ or other curation platforms.  They obtained access to these platforms and learned how to use them on the job at AiDigital.  AiDigital team members taught Mr. Kuchera and Mr. Held how to use the platforms between December 2022 and January 2023.

33.     AiDigital has assumed the cost associated with renting office space for Mr. Kuchera and Mr. Held to work out of a coworking space in the Fitler Club located at 2400 Market Street, Philadelphia, Pennsylvania.

**IV.    Anonymous Information from Eymard V. Ventura.**

34.    On November 12, 2023, I received an anonymous email from someone named Eymard V. Ventura ("Ventura") that stated "[t]wo of your employees in Philadelphia (Kyle is one and I did not catch the others name) are running a side business and leveraging your platform and connections to do so, basically stealing from you."  A true and accurate copy of this email chain is attached as **Exhibit C**.

35.    After I followed up with Ventura, he/she provided more detail by email.   On November 21, 2023, Ventura said that he/she often sees three individuals working together at the club in Philadelphia, and that on this particular occasion, "we were situated in the cafe where I was able to hear this conversation clearly."  Ex. C at 5.  Ventura further explained:

> Three people (the ones I see often) are running a side business called Mavern Marketing. During this meeting the three of them were explaining the business to a fourth person who it seemed like was being brought on board to join the team. Two of them work for your company and one does not. The person who does not is the only one whos name and information is advertised publicly on the website etc so as to hide the two that work for your company. Unfortunately most of the technicalities of what they are doing were over my head but the term arbitrage was used quite a bit as well as ensuring that nobody at your company would be able to find out this is going on because of the fact that this business leverages resources from AI Digital. It was clear that it was a shady secretive operation.

*Id*.

36.    On November 26, 2023, Ventura stated, "The name of the third person who does not work for you is Michael, I don't have a last name.  I knew they worked for AI digital because it was clearly explained to the fourth person that day and your name was brought up numerous times."  *Id.* at 4–5.

37.    After I asked Ventura further questions, he/she emailed:

> From what I gathered they are pretty deliberate about making sure their names are not tied to the business. The one guy who is listed is

> definitely the third person I mentioned. I did a little googling and
> found a website for the company mavernmarketing.com. One
> interesting thing I noticed is the company has two google reviews,
> and one of which is from one of the guys girlfriend who I see at the
> club all the time. That business is listed as closed and seems to be
> now operating as this one https://www.mavernmedia.com/.

*Id*. at 4.

38.    Ventura has not been willing to meet or speak with me on the phone, and I do not

know Ventura's real name.

**V.    Mavern.**

39.    After I received this information, I conducted online research regarding the Mavern

Media and Mavern Marketing entities.

40.    Mavern Media LLC is the only Mavern entity registered in Pennsylvania.  There is

no entity registered with the name Mavern Marketing.  It appears that Mr. Kuchera and Mr. Held

are using different d/b/a names for the same entity.  A true and accurate copy of a Pennsylvania

Business Search for Mavern is attached as **Exhibit D**.

41.    Mavern Marketing's website at https://www.mavernmarketing.com lists Michael

Burns ("Mr. Burns") as a co-founder.  A true and accurate copy of that webpage is attached as

**Exhibit E**.  I believe Mr. Burns is the third person working with Mr. Kuchera and Mr. Held.

42.    An online search indicates that a company called Mavern Marketing had its address

listed on Google Maps as 2400 Market Street in Philadelphia, which is the same address of the

Fitler Club where Mr. Kuchera and Mr. Held work.  It is now listed as permanently closed.  A true

and accurate copy of a Google search for Mavern Marketing is attached as **Exhibit F**.

43.    Mavern Marketing has just two Google reviews.  One of them is from Rebecca

Perschon, Mr. Kuchera's girlfriend, and the other is from Jennifer Burns, Mr. Burns' wife.  A true

and accurate screenshot of the Google reviews for Mavern Marketing is attached as **Exhibit G**.

44.    The Wayback Machine is a website that contains a digital archive of many websites. It allows the user to go "back in time" to see how websites looked in the past.  *See* https://archive.org/about/.  A true and accurate screenshot of the version of the Mavern Marketing homepage that was online on July 26, 2023, available at https://web.archive.org/web/20230726151405/https://www.mavernmarketing.com/, is attached as **Exhibit H**.

45.    The address listed on the Mavern Marketing website on that date was 1919 Market Street, Unit 2602, Philadelphia, PA 19103.  *See* Ex. H at 5.  ███████████████████████

██████████████████████████

46.    Mavern Media's LinkedIn page also shows the 1919 Market Street address. Attached as **Exhibit I** is a true and accurate copy of Mavern Media's "About" page on LinkedIn, available at https://www.linkedin.com/company/mavern-media/about/.  On November 26, 2023, the LinkedIn page showed "Lance Phillips" listed as an employee.  A true and accurate screenshot of Mavern Media's LinkedIn page as of November 26, 2023 is attached as **Exhibit J**.  However, as of December 15, 2023, Lance Phillips is no longer listed as an employee.  A true and accurate screenshot of Mavern Media's LinkedIn page as of December 15, 2023 is attached as **Exhibit K**.

## VI.    AiDigital's Investigation.

47.    On or about November 17, 2023, AiDigital retained Kidon Creative Intelligence to investigate the misappropriation of its trade secrets.

48.    The accompanying declaration of Avi Ben-David ("Mr. Ben-David") details that investigation, in which he took an undercover approach using the alias Adam Rosse and met with Mr. Kuchera, Mr. Held, and Mr. Burns on various occasions.

### A.    Initial Zoom Meetings between Mr. Ben-David and Mavern Media Members.

49.    I have reviewed the video of a Zoom meeting between Mr. Ben-David and Mr.

Burns on December 4, 2023 (the "First Meeting") that is attached as Exhibit D to Mr. Ben-David's declaration. I have also reviewed the video of a Zoom meeting between Mr. Ben-David, Mr. Burns, and another individual on December 5, 2023 (the "Second Meeting") that is attached as Exhibit E to Mr. Ben-David's declaration. I recognize the voice of "Lance" in the Second Meeting as Mr. Held's voice.

50.     During the First Meeting, Mr. Burns explained:



Ben-David Decl. Ex. D, at 4:21–39.[1] By comparison, in a recent sales deck that Mr. Kuchera and Mr. Held helped create, which contains the key points for an AiDigital representative to address in a prospective client pitch (the "Sales Deck"), Slide 6 discusses LucidX's ███████████████ ████████████████████████████████████████████ █████████ A true and correct copy of this sales deck is attached as **Exhibit L**. A true and correct copy of a Slack chat (an instant messaging system used by businesses) between Mr. Kuchera and myself from December 17, 2023 where Mr. Kuchera admits his and Mr. Held's involvement in the Sales Deck is attached as **Exhibit M**. The Sales Deck also highlights LucidX's ████████████ ████████████████████████████ Ex. L at 7. Mr. Burns has taken almost verbatim information from the Sales Deck and utilized it to pitch Mavern Media to a potential customer.

51.     Mr. Burns also highlighted:



---

[1]     Pincites to video exhibits refer to the timestamp of the recording.

Ben-David Decl. Ex. D, at 6:06–26.  The Sales Deck outlines ███████████████████

█████████████████████████████████████████████████████  Ex.

L at 2.  It also states that LucidX's █████████████████████████████████████

█████████████████████████████████  *Id.* at 6.  Again, Mr. Burns has

taken proprietary information regarding how AiDigital utilizes its contextual tools and targeting

functions to pitch this information to Mr. Ben-David as a potential client of Mavern Media.

52.   Mr. Burns further stated, ██████████████████████████████████████

██████████████████████  Ben-David Decl. Ex. D, at 8:58–9:02.  The Sales Deck outlines that

clients choose LucidX because ████████████████████████  Ex. L at 9.

53.   Mr. Burns then said:



Ben-David Decl. Ex. D, at 12:54–13:12.  █████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████  Ex. L at 8.  Mr. Burns' reference to █████████████ is taken from

AiDigital's pitch materials.

54.   Mr. Burns further stated:

Ben-David Decl. Ex. D, at 15:57–16:24.  Mr. Burns also asserted, ███████████████

████████████████████████████████████████████████████████████████████████

████████████████████  *Id.* at 17:14–30.  The Sales Deck outlines the start of a LucidX campaign:

 Ex. L at 10. Further, LucidX would

*Id.* Mr. Burns outlined that Mavern Media takes the same steps as AiDigital in tailoring an ad campaign to ensure it reaches the right audience and it is not shown in conjunction with other content that would weaken the brand.

55.     During the Second Meeting, Mr. Held stated:



Ben-David Decl. Ex. E, at 7:28–52. The Sales Deck outlines,

Ex. L at 8. Mr. Held described to a prospective client of Mavern Media the dynamic pricing models that AiDigital currently employs.

**B.     AiDigital Off-Site Summit.**

56.     AiDigital held an off-site summit for its curation team in Miami, Florida from December 4, 2023, through December 6, 2023, which I, along with Mr. Kuchera and Mr. Held, attended. On December 5, at 12:30 EST, Mr. Held was supposed to be attending a team meeting, but said he was going to his room to take a nap. Instead, during that same time, Mr. Held was on the Zoom meeting with Mr. Ben-David and Mr. Burns.

57.     The next day, during one of the sessions, Mr. Held was asked about how he learned to build client relationships and understand how the curation platforms work. Mr. Held responded that it is "intellectual property" and that a random person could not do it. He further said that he learned it over six months at AiDigital.

58.    I also asked Mr. Held how he had met the clients and prospects he has worked with; he responded that it was all through Ben Gordon, AiDigital's Business Development Representative.

59.    Additionally, Mr. Kuchera admitted that he knows how to delete contacts and deals in HubSpot, the customer relationship management ("CRM") software used by AiDigital to manage, track, and store information related to the Company's current and potential customers.  In HubSpot, the Company stores its contacts (individuals that are customers or potential customers) and the emails with those customers as well as call notes and meeting information.  The Company also stores deal information in HubSpot, including the stage of a deal with a customer or potential customer and the dollar amount.  HubSpot automatically logs all emails and meetings.  In order to not log an email or meeting, the employee must manually remove the HubSpot BCC from his/her email.  But the Company expects its employees to check to make sure HubSpot logs all contacts and deals with customers or potential customers.

60.    I checked HubSpot.  Mr. Ben-David's alias was not logged as a contact and neither was his email with Mr. Kuchera during the undercover operation.  This means that Mr. Kuchera purposefully removed the HubSpot BCC from his email so that Mr. Ben-David's contact and email was not logged in the system.

61.    In addition, I checked the HubSpot audit log for the past 90 days for Mr. Kuchera and Mr. Held.  A true and correct copy of that log is attached as **Exhibit N**.  The log shows that Mr. Kuchera deleted nine deals and contacts from HubSpot in the past 90 days.  Unfortunately, the details of what was deleted cannot be restored without notifying Mr. Kuchera, so I have not yet restored that data.  While there are some legitimate reasons why an employee may delete an entry (for example, the entry was made in error or was a duplicate), this number of deletions over

a 90-day period is unusual.

      **C.**    **In-Person Meeting Between Mr. Ben-David, Mr. Burns, and Mr. Kuchera.**

62.     I reviewed the videos of an in-person meeting between Mr. Ben-David, Mr. Burns, and Mr. Kuchera on December 13, 2023 (the "Third Meeting") that are attached as Exhibits H–N to Mr. Ben-David's Declaration. I recognize the face and voice of Mr. Kuchera in these videos. I have also reviewed the follow-up emails between Mr. Ben-David and Mr. Burns between December 14 and December 16, 2023, along with the corresponding email attachments, that are attached as Exhibits O–R to Mr. Ben-David's Declaration.

63.     During the Third Meeting, Mr. Kuchera acknowledged:



Ben-David Decl. Ex. I, at 0:09–1:35. By comparison, in an AiDigital client pitch made to ▮▮



▮▮▮▮▮ on August 22, 2023 (the "▮▮▮▮▮"), Mr. Kuchera stated:



A true and correct copy of the video of this pitch is attached as **Exhibit O**. ▮▮▮▮▮ is a company that provides advertising data used by AiDigital, including audience data about TV or website

viewership. ███████████████████████████████████████

Mr. Kuchera drew upon his knowledge from AiDigital ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

64.    Mr. Kuchera also stated:

███████████████████████████████████████████████████████████████████████

Ben-David Decl. Ex. I, at 3:04–19.  By comparison, in an AiDigital client pitch made to ██████

on November 30, 2023 (the ███████████ Mr. Kuchera stated that the █████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████ A true and correct copy of the transcript of this pitch is attached as **Exhibit**

**P.** █████████████████████████████████████ As such, Mr. Kuchera took

an essential part of AiDigital's pitch and used it to Mavern Media's benefit.

65.    Mr. Kuchera further said Mavern Media is ███████████████████████████

████████████████████████████████████████████████████

██████████████████████████████ Ben-David Decl. Ex. J, at 0:18–1:33.  By

comparison, in the ███████████, Mr. Kuchera stated that AiDigital is ████████████████

████████████████████████████████████████████████████

██████████████████████████ Ex. P at 2.  This is exactly the kind of activity AiDigital engages

in when optimizing a particular campaign for a client.  And Mr. Kuchera learned this methodology

by working at AiDigital, specifically in building out its programmatic curation services.

66.    During the Third Meeting, Mr. Kuchera also acknowledged, "I actually just had

dinner with ███████ last night, . . . we're a big partner of theirs." Ben-David Decl. Ex. J, at 0:18–

1:33. The dinner Mr. Kuchera referenced was a dinner held on December 12, 2023 at Gaonnuri

located at 1250 Broadway, Floor 39, New York, New York 10001 between ██████ and

AiDigital to discuss its partnership and relevant opportunities. The following people attended the

dinner: ████████████████████ representative), Mr. Bayer (President of

AiDigital), Mr. Kuchera, and Mr. Held. Mr. Kuchera attended this dinner on behalf of AiDigital,

not Mavern Media.

67.    Mr. Kuchera further stated:



Ben-David Decl. Ex. K, 0:12–1:03. And when asked if this was a software that Mavern Media

developed, Mr. Kuchera confirmed "yes." *Id.* at 1:04–07. By comparison, in the ████████

Mr. Kuchera stated that AiDigital has ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████ Ex. P at 1–2. Furthermore, in the sales deck that was

part of the ████████ (the "████████████") Slide 6 outlines that LucidX is focused on

████████████████████████████████ A true and correct copy

of this sales deck is attached as **Exhibit Q**. Again, Mr. Kuchera learned how to build and utilize

these contextual tools by working at AiDigital. And both AiDigital and Mavern Media's

contextual platforms use artificial intelligence to pull reporting data that is fed into their systems

to create deals.

68.     Mr. Kuchera also stated, ███████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████ Ben-David Decl. Ex. K, at

2:21–45.  By comparison, in the ████████████ Mr. Kuchera  said  that  ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Ex. P at 1.  In

essence, Mr. Kuchera admitted that Mavern Media is not only developing a competing contextual

tool with AiDigital, but also that this tool functions in the same way.

69.     Mr. Kuchera further admitted:



Ben-David Decl. Ex. K, at 5:20–7:03.  By comparison, in the ████████████ Mr. Kuchera stated

that AiDigital is

Ex. P at 3.  And in the ████████████████ AiDigital referred to itself as a ████████████

████████ Ex. Q at 13.  Again, Mr. Kuchera used AiDigital's exact branding in his pitch to Mr.

Ben-David on behalf of Mavern Media.  Mr. Kuchera took AiDigital's ████████████████████

███████████████████████████████████████████ and imparted that strategy

for Mavern Media's benefit.

70.     Mr. Kuchera also explained Mavern Media's pricing optimization structure:



Ben-David Decl. Ex. M, at 0:06–57.  By comparison, in the ███████, Mr. Kuchera

emphasized AiDigital is generating ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████ Ex. P at 2.  And the Sales Deck describes that ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ Ex. L at 8.  Mr. Kuchera, on behalf of Mavern Media, represented to

Mr. Ben-David the pricing structure of AiDigital and usurped the way AiDigital optimizes its

client's campaigns.

71.    During the Third Meeting, Mr. Kuchera also discussed the work he had done with

████ and only clarified that the work was done through AiDigital, not Mavern Media, when Mr.

Ben-David asked.    Ben-David Decl. Ex. N, at 5:55–6:18.    Exhibit R of Mr. Ben-David's

Declaration lists the clients of Mavern Media: █████████████████████████████

████████████████████████████████ In his division at AiDigital, Mr. Kuchera

works with seven of the nine clients ████████████████████████████████

████████████████ Presumably, Mr. Kuchera brought ████ along with the other six

clients, to Mavern Media, which would be a violation of his employment agreement.

72.    Mr. Kuchera also stated "Lance . . . can handle any of the technical stuff."  Ben-

David Decl. Ex. N, at 0:05–48.  He later said that he, Mr. Burns, and Mr. Held are all partners at

Mavern Media and that "Noah . . . [is] very technical . . . [and can] go into the platform and just figure this stuff out." *Id.* at 4:11–54. As mentioned previously, Mr. Held is presumably posing as Lance at Mavern Media. And since joining AiDigital, Mr. Held has inserted himself into the technical side of programmatic curation and been given access to the curation platforms.

73.    In a conversation I had with Mr. Held on December 15, 2023 via Slack, Mr. Held confirmed that when he started at AiDigital, he "knew nothing about programmatic [curation]" and, that while being here for the past year, he "really learned . . . [t]he underlining of how programmatic actually functions." A true and correct copy of this Slack chat is attached as **Exhibit R**. He further stated he learned "[p]retty much how the whole sell side works. How inventory is sourced. How it plugs in. How DSPs and SSPs relationships work. Bid requests . . . All the things you wouldnt [sic] know if you weren't involved on the sell side. Where all the execution takes place." *Id.* at 2. Again, he acknowledged he "100% learned by doing [programmatic curation] strictly here [at AiDigital]." *Id.* at 3. Later in the conversation, Mr. Held confirmed that everything he learned about programmatic curation and the relationships he built with the curation platforms and the clients are intellectual property and trade secrets. *See id.* at 4.

74.    In Mr. Burns' email to Mr. Ben-David on December 16, 2023, Mr. Burns provided the contact information for ███████████████ and stated, "When reaching out please reference myself and Mavern Media and not Kyle, as they do not know him (being that he is a passive investor and is full time with AI). He does some consulting but my team runs the operations." Ben-David Decl. Ex. O, at 3. Mr. Kuchera does in fact know ████████ because AiDigital introduced them to each other, and Mr. Kuchera had dinner with ████████ on December 12, 2023 along with other AiDigital representatives. Mr. Held has also admitted to meeting ████████ through AiDigital approximately seven or eight months ago. Ex. R at 5.

**D.** **Other Evidence of Mr. Kuchera's and Mr. Held's Solicitation of AiDigital Clients.**

75. A client of AiDigital informed me that Mr. Burns sent her a message on LinkedIn soliciting her on November 21, 2023. In the message, Mr. Burns said, "Just wanted to reach out and connect around your programmatic buys. Are you interested in testing any premium supply via Private Marketplace (PMP) deals right now?" A true and correct copy of that message as sent to me by the client (with the client's name redacted) is attached as **Exhibit S**.

76. Mr. Kuchera and Mr. Held have also recently been exploiting AiDigital funds to take AiDigital curation clients to sporting events and ████████████ personnel to expensive dinners and charging these events to the AiDigital expense account. It is likely they are soliciting these customers on behalf of Mavern Media.

## VII. Conclusions.

77. Based upon the information discovered thus far, including Mr. Ben-David's undercover investigation, it appears that Mr. Kuchera and Mr. Held have been working with Mr. Burns to misappropriate AiDigital's trade secrets for Mavern Media, namely (i) AiDigital's client pitches and branding materials, including the LucidX curation sales pitch and overview decks, (ii) AiDigital's ad campaign process, (iii) access to ████████████ through AiDigital, (iv) the process to use ████████████ data sets for programmatic curation, (v) the data sets for programmatic curation, (vi) the tools and features[2] used to create data sets for programmatic curation, (vii) AiDigital customers for which the data sets are used, and (viii) the pricing between AiDigital, ████ and the customers (together, the "Trade Secrets"). AiDigital has taken reasonable measures to keep this information secret. It does not share its methodology

---

[2] The tools and features are the contextual tools, utilization of data sets, intelligent targeting, smart curation, dynamic deal optimization, and keywords mentioned herein.

for using ███ data sets for programmatic curation with anyone outside of AiDigital. And only those employees who directly work in programmatic curation, such as Mr. Kuchera and Mr. Held, know details of the curation process.

78.    Mr. Kuchera and Mr. Held appear to have abused the goodwill associated with AiDigital's relationship with ███ to create their own account with ███ to use for Mavern Media. They would not have been able to obtain this account if they had not already been introduced to ███ through AiDigital, as ███ only contracts with known companies and individuals in advertising. Further, Mr. Kuchera and Mr. Held appear to be exploiting the programmatic curation methodology they learned while at AiDigital to use data sets from ███ for particular advertisers on behalf of Mavern Media. And as employees who directly work in programmatic curation, Mr. Kuchera and Mr. Held know details of the curation process.

79.    Mr. Kuchera, Mr. Held, and Mr. Burns have solicited at least one AiDigital client, in violation of their legal obligations to AiDigital, in an attempt to move her business to Mavern Media. Further, it appears they are plotting to take other customers and corporate business opportunities away from the Company in violation of Mr. Kuchera's and Mr. Held's fiduciary and contractual duties to the Company.

80.    As Mr. Kuchera and Mr. Held have access to AiDigital's pricing information and thus understand the profit margins on client deals, they can use that insight to undercut AiDigital and offer more competitive pricing to the same customers through Mavern Media.

81.    Defendants' actions have undermined and will continue to undermine AiDigital if not enjoined. If Defendants do not cease their activities immediately, the damage to the Company's goodwill and business will be certain and incalculable.

82.    The full extent and magnitude of Defendants' violations cannot be accurately ascertained at this time.  Further damage to AiDigital can only be prevented by seizing Mr. Kuchera's and Mr. Held's devices and ordering Defendants to immediately cease all use of data acquired from AiDigital.

83.    Mr. Kuchera has a ThinkStation P3 Tiny Workstation model desktop computer from Lenovo at his home office.  Mr. Kuchera stated that he takes many AiDigital sales calls from Zoom on this personal desktop computer.

84.    Mr. Kuchera also has an iPhone 14 Pro Max 256 GB in the color deep purple.

85.    Mr. Held has a personal MacBook Pro laptop that is around three years old.

86.    Mr. Held also has an iPhone 15 (not the larger Pro Max model).  His cell phone carrier is Verizon.  Based on his statement during the Zoom, Mr. Held joined the Zoom with Mr. Ben-David on December 5 from this iPhone.

87.    I believe that Mr. Kuchera and Mr. Held are using these devices to operate Mavern Media using AiDigital's Trade Secrets.

88.    The Company hired and paid Mr. Kuchera and Mr. Held with the understanding that they would work for the best interests of the Company and not divert corporate opportunities for themselves that expressly violate the Employment Agreements and applicable law.  I never would have hired Mr. Kuchera and Mr. Held if I had known that they did not intend to honor their obligations to the Company.  Defendants' conduct is injurious to the Company, counter to principles of fair dealing and competition, and against the law.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 19, 2023

_____
Stephen J. Magli